*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* THOMAS, Minors.

UNPUBLISHED
July 11, 2024

No. 364249
Oakland Circuit Court
Family Division
LC No. 2009-757748-NA

AFTER REMAND

Before: GARRETT, P.J., and PATEL and MALDONADO, JJ.

PER CURIAM.

We remanded this matter to the trial court to make "appropriate findings of fact" and for "articulation of a jurisdictional analysis that is amenable to appellate review" of the court's denial of jurisdiction in this child protective proceeding. *In re Thomas*, unpublished per curiam opinion of the Court of Appeals, issued January 4, 2024 (Docket No. 364249), p 1 (*Thomas III*). The Department of Health and Human Services (DHHS) and the children's lawyer-guardian ad litem (LGAL) moved below for consideration of up-to-date information. However, the trial court chose not to conduct a hearing or to "expand the record with up-to-date information" before making its findings on remand. See *In re Thomas*, unpublished order of the Court of Appeals, entered January 4, 2024 (Docket No. 364249) (*Thomas IV*). The trial court issued a 47-page opinion, expanding its original factual recitation and making record findings on various disputed issues, before reaffirming its denial of jurisdiction. Although we find the allegations raised by the DHHS and LGAL in their supplemental pleadings concerning, they were neither part of the jurisdictional petition nor were they in evidence below. If the DHHS finds it supportable, these allegations may be raised in a new petition.

On the current record, however, most of the trial court's findings are based on its assessment of the witnesses' credibility, findings with which we may not interfere. Accordingly, we must affirm the trial court's denial of jurisdiction.

## I. BACKGROUND

Respondents are no strangers to the child protective system. Respondent-father received reunification services in the 1990s in connection with one of his two older children. Both his

-1-

children were placed with their mothers and his rights were never terminated. Respondent-mother's rights to six children were terminated in two separate orders in 2004 and 2006, based on physical abuse, medical neglect, and failure to protect. She received services several times between the birth of her first child in 1989, and the 2004/2006 terminations.

Respondents' first child together, EET, was born in Ohio in 2008. After her birth, respondents returned to Michigan. The DHHS filed a termination petition in March 2009. The trial court, Oakland Circuit Judge Mary Ellen Brennan presiding, took jurisdiction and terminated respondent-mother's parental rights at the initial disposition based completely on the doctrine of anticipatory neglect. This Court reversed the termination, concluding that even if a statutory ground for termination was established, termination was not in EET's best interests. See *In re Thomas*, unpublished per curiam opinion of the Court of Appeals, issued December 7, 2010 (Docket No. 296353) (*Thomas I*). Respondents' second child, MDT, was born in August 2012.

In November 2018, Child Protective Services (CPS) investigated a report that respondent-father's brother, DT, sexually abused EET. CPS requested respondents bring the children for forensic interviews in November 2018, September 2019, and October 2019, but respondents refused on the advice of counsel. In the opinion on remand, the trial court noted the DHHS moved to compel the forensic interview in November 2018, but the trial court denied the motion. While the matter was pending, voluntary services were offered to the family, but respondents stopped participating after the court dismissed the matter.

In November 2019, the DHHS removed the children from respondents' care on an emergency basis and placed them with a maternal aunt, ES, who was later appointed as next friend for EET. The DHHS petition alleged that respondents delayed more than a year to secure dental treatment for MDT's severe tooth abscesses, neglected the children's hygiene, and engaged in domestic violence in front of the children; the children had missed more than a month of school during the previous schoolyear; MDT, who suffered from "sensory issues," acted out sexually against his sister and was not completely potty trained at the age of seven; and EET had been sexually abused by DT and an adult half-brother who lived in the home, JF. The DHHS alleged that respondent-mother physically abused EET. The petition further stated respondent-mother participated in a psychological evaluation in 2009, and was deemed to lack insight into her behavior at that time. The DHHS alleged respondent-father had a history of opioid abuse following a 2001 brain surgery and had been diagnosed with bipolar disorder but would not take prescribed medication. In granting the removal petition, Judge Brennan cited several factors, including respondent's refusal to bring the children for a Care House interview.

Respondent-mother appealed the order removing the children, but this Court affirmed. *In re Thomas*, unpublished per curiam opinion of the Court of Appeals, issued August 20, 2020 (Docket No. 352575) (*Thomas II*). In affirming the removal, this Court noted respondents had a combined total of 90 CPS complaints filed against them. *Id*. at 1.

Respondents requested an adjudicative trial. That trial and vital steps in the pretrial process were delayed several times to allow compliance with the Indian Child Welfare Act, 25 USC 1901 *et seq*., and the Michigan Indian Family Preservation Act, MCL 712B.1 *et seq*., although it was later determined the children were not entitled to membership in any tribe. The matter was further delayed due to COVID shutdowns and subsequent court backlogs, attorney Internet connectivity

issues, and scheduling conflicts. The court did not officially find probable cause to authorize the petition until February 2021. Judge Brennan then recused herself from the case, noting her disagreement with this Court's 2010 opinion reversing the termination of respondent-mother's rights to EET. The case was then transferred to Judge Kameshia Gant.

The adjudicative trial finally began on July 12, 2021, and spanned eight days across several months, not ending until February 25, 2022. The court did not issue its jurisdictional decision until September 1, 2022, more than six months later, due to personal family issues. As noted in *Thomas III*, unpub op at 3, the court's opinion required additional findings and analysis:

> At the outset, the court identified the witnesses and the relevant jurisdictional statutes. The court then noted that several of the allegations in the petition were undisputed—those related to respondents' prior CPS history and the prior termination of respondent-mother's parental rights to six other children. The remaining allegations in the petition were considered disputed. The court then read each allegation into the record and summarized, in great detail, trial testimony that was arguably related to the allegation. The court, however, did not engage in any analysis of the evidence, announce any credibility determinations, or otherwise make any findings of fact about the disputed matters. The court simply summarized the testimony of each witness. When it was done with this exercise, the court abruptly concluded, without any analysis, that the [DHHS] failed to establish by a preponderance of the evidence that the children came within the court's jurisdiction. [Footnoted omitted.]

MDT returned to his parents' care on September 12, 2022, after the court denied the jurisdictional petition. For reasons not explained in the record, EET remained with ES until January 5, 2023.

We remanded for the trial court to "make adequate findings of fact" and to "explain how it resolved the many disputed issues" "to permit meaningful appellate review of its decision" and "to enable this Court to understand why it determined that the evidentiary record did not warrant the assumption of jurisdiction." *Id*.

## II. PROCEEDINGS ON REMAND

As noted, the trial court decided on remand not to accept up-to-date evidence. Like in its original ruling from the bench, the court summarized the testimony of the witnesses taken at the eight-day adjudicative trial. The court went into greater detail than in its original ruling, but nothing truly new was added to the factual summary.

The trial court found a lack of sufficient evidence to support taking jurisdiction over the children under either MCL 712A.2(b)(1) or (2). In doing so, the court noted respondent-mother's prior terminations occurred 17 years earlier and the prior termination of her rights to EET was reversed. The court determined there was no evidence supporting the allegation in the current petition that respondent-mother underwent a neuropsychological evaluation in 2009, let alone that a professional concluded she lacked insight into her behaviors. Although respondent-mother has a learning disability, she had not received services for that disability since she was a minor.

The court also found a lack of evidence that respondent-father had a significant history of untreated mental health issues. The caseworker testified she discovered respondent-father suffered from bipolar disorder from reviewing prior CPS records. However, she could not direct the court to the location of this information. And the caseworker could not remember any pertinent details about the diagnosis and prior treatment. The caseworker did not even know why respondent-father had a shunt in his brain. Respondent-father, on the other hand, explained that he underwent brain surgery in 2001, suffered from hydrocephalus requiring a shunt in his brain to drain fluid, and had a history of seizures.

The court acknowledged the family's history of services. The court found respondents had not refused services. Rather, when the 2018 petition was dismissed, respondents were no longer required to participate and chose to abstain.

The court discredited the DHHS's allegation that respondents had delayed in securing dental treatment for MDT. Both respondents and MDT's maternal grandfather testified about the delay in beginning treatment. Because MDT was covered by Medicaid, the family had to secure two to three estimates before treatment would be approved. This took a long time because MDT's special needs and sensory issues made it difficult to find willing dental care providers who also accepted Medicaid. Once the estimates were secured, Medicaid approved treatment through MDT's existing dentist. The witnesses explained MDT saw the dentist two to three times in the fall of 2019, in preparation to begin the extensive treatment regimen. However, the DHHS removed the children just before the first procedure was scheduled.

The court rejected the DHHS's allegation of educational neglect. The children's absences were excused and the school district never pursued truancy actions. The court reviewed the parties' exhibits and determined the children missed school for medical and dental appointments, and sometimes because of behavioral issues.

In regard to the allegations of sexual abuse against EET, the court accepted the testimony of respondents and the maternal grandfather that DT had not lived in their home since 2018, and had never been left alone with the children. Respondent-mother claimed EET did not make the allegation of sexual abuse. Respondent-mother blamed her sister, ES, for making the report. The court acknowledged respondents did not cooperate in the investigation into EET's allegations of sexual abuse and refused to bring the children for a forensic interview, but found their explanation of acting on the advice of counsel "reasonable." The court concluded there simply was no record evidence to support the DHHS's allegation of sexual abuse.

The court credited respondents with being truthful about their criminal histories. The court noted neither party was then on probation or had any charges pending against them. Additionally, respondents' past offenses were not of the type to present a risk to their children. Respondent-father admitted to a domestic violence charge in the 1990s, and respondent-mother testified about her abusive relationship with her ex-husband. Both the children's maternal grandfather and respondent-mother's older daughter, AO, who had moved in with respondents, testified the domestic violence reports related to respondents' household were instances of mistaken identity. Specifically, on the occasions when police came to the residence to investigate noise and domestic violence reports, they were looking for individuals not matching the descriptions of anyone living in the home. The court found this testimony credible. Based on evidence that the reports of

-4-

domestic violence in respondents' home were never confirmed and likely arose from incidents at a neighboring home, the court found insufficient evidence to support those allegations.

The court found no evidence that respondent-father abused opiates. Respondent-father admitted he was prescribed opiates following his 2001 brain surgery and used them "for a few years." Respondent-father claimed the medication made him sick and he would never use them again. He denied taking opiates prescribed to his brother and denied taking JF's psychotropic medications.

The court determined the caseworker gave conflicting testimony about the children's appearance and personal hygiene. MDT's special education teacher had no concerns about MDT's hygiene, and respondents explained how MDT's special needs affected their ability to bathe and dress him. For example, to accommodate his sensory issues, respondents purchased several of the same outfit for MDT. The court found no evidence to support the allegations about the children's appearance and cleanliness.

The caseworker expressed concern that respondents did not appropriately react to MDT's physical aggression, inappropriate statements, and other behavioral concerns. The court found respondents, the maternal grandfather, and MDT's teacher credible in this regard. The teacher testified that MDT was in the emotionally impaired program and had developmental issues. He sometimes acted out with physical and verbal behaviors. MDT had issues with "hitting, kicking, spitting, swearing, threatening to harm others, and running away from adults." MDT had an individualized education plan and received occupational therapy, physical therapy, speech and language support, and social work services through the school. The maternal grandfather conceded MDT is stubborn and has "outbursts of rage." He also noted he and respondents attended frequent meetings at the school to plan for MDT. Respondents testified they took away privileges as a form of discipline and implemented a safety plan at home. The court found this evidence credible.

The caseworker noted that during her initial meeting with EET, she observed three small bruises on the child's thigh. Based on EET's explanation for the marks, the caseworker had concerns about the child's care at home. Respondent-mother admitted EET accused her of physical abuse, but noted the child's story "kept changing" and the pediatrician found no signs of abuse. The court found the maternal grandfather's testimony on this issue "to be the most persuasive." EET alleged the bruises were caused by her mother slapping her very hard on the leg. However, when the grandfather questioned the child, she did not claim respondent-mother hit her. The court determined respondent-mother had not struck EET.

The court found no evidence to support allegations that respondent-mother "grabbed EET by her face and head and was screaming at her," that MDT acted out sexually toward EET, or that JF had inappropriately touched EET. The court acknowledged the caseworker's testimony that respondent-mother pushed EET away when the child tried to hug her during an interview with CPS at the school. The court also acknowledged there was evidence that MDT had kicked EET, but a lack of evidence of sexual behavior against his sister.

In relation to MDT not being fully potty trained at the age of seven, the court emphasized testimony from MDT's teacher and respondents that this was not unusual given the child's sensory

issues. Indeed, MDT was not the only child in his emotionally impaired class who needed assistance with potty training. The court determined this was not a valid concern for the petition.

The court reaffirmed its decision to deny jurisdiction over the children and this matter returned to this Court.

## III. SUPPLEMENTAL BRIEFS

The children's LGAL and the DHHS filed supplemental briefs after remand. The LGAL noted they requested a new home study to determine the current adequacy of the children's living environment. The LGAL requested up-to-date information about the children's academic performance, medical records, and confirmation that the children were in counseling. The LGAL asserted respondents had not allowed the children to contact other family members, including ES, since they returned to respondents' care. Concerns were raised that the children were not enrolled in school but also were not being home schooled, and had not been brought for therapy. EET's social media posts reflected "suicidal ideations, pleas for help, over-sexualized behavior, and threats of self-harm." Evidence was also presented that the children were subject to continuing abuse in the home. The LGAL lamented that the trial court refused to consider this information and evidence.

Unfortunately, these issues and evidence are not properly before us. Should the DHHS believe the evidence supports it, the DHHS may file a new petition raising these issues in the trial court.

## IV. LEGAL PRINCIPLES

The LGAL, DHHS, and EET through her next friend continue to seek reversal of the trial court's jurisdictional order. The DHHS also seeks remand for further consideration before a new judge, contending "the trial judge seemed to be concerned about protecting her statistics rather than protecting the minor children."

As stated in *Thomas III*, unpub op at 2:

"In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase." *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). The adjudicative phase determines whether the trial court can exercise jurisdiction over the children. *Id*. This process begins "when a petition is filed in the trial court that contains facts constituting an offense against a child under MCL 712A.2(b) of the juvenile code, MCL 712A.1 *et seq*." *In re Long*, 326 Mich App 455, 459; 927 NW2d 724 (2018). After a petition has been filed, "the trial court must hold a preliminary hearing and may authorize the filing of the petition upon a finding of probable cause that one or more of the allegations [in the petition] are true and could support the trial court's exercise of jurisdiction under MCL 712A.2(b)." *In re Ferranti*, 504 Mich 1, 15; 934 NW2d 610 (2019). If the court authorizes the petition, the respondent-parent can demand a trial to contest its merits. *Sanders*, 495 Mich at 405. Following a trial, the court may exercise jurisdiction if the [DHHS] proves "by a preponderance of the evidence one of more of the statutory grounds for jurisdiction alleged in the petition." *Id*.

* * *

We review a trial court's decision to exercise jurisdiction over a child for clear error in light of the court's findings of fact. *In re Kellogg*, 331 Mich App 249, 253; 952 NW2d 544 (2020). . . .

Clear error is a high standard. "A decision qualifies as clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made. Clear error signifies a decision that strikes us as more than just maybe or probably wrong." *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009) (quotation marks and citations omitted). The standard is even higher when the resolution of factual issues comes down to a credibility contest amongst witnesses. "The deference required by MCR 2.613(C) can make a critical difference in" reviewing difficult or close cases. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). "In contrast to the reviewing court, the trier of fact has the advantage of being able to consider the demeanor of the witnesses in determining how much weight and credibility to accord their testimony." *Id.*

## V. ANALYSIS

MCL 712A.2(b) provides the grounds under which a court may take jurisdiction over a child in a child protective proceeding. Here, the DHHS relied on MCL 712A.2(b)(1) and (2), which provide for taking jurisdiction over a child, in relevant part, as follows:

(1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, [or] who is subject to a substantial risk of harm to his or her mental well-being. . . . As used in this sub-subdivision:

* * *

(B) "Neglect" means that term as defined in . . . MCL 722.602.

* * *

(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. As used in this sub-subdivision, "neglect" means that term as defined in . . . MCL 722.602.

MCL 722.602(d), in turn, defines "neglect" as:

harm to a child's health or welfare by a person responsible for the child's health or welfare that occurs through negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care, though financially able to do so, or the failure to seek financial or other reasonable means to provide adequate food, clothing, shelter, or medical care.

The allegations of neglect were based, in part, on the children's school attendance record, MDT's behaviors and difficulty potty training, and the delay in securing extensive dental work for MDT. The court considered the evidence regarding the children's extensive medical appointments, which, unfortunately, required EET to miss 45 days of school and MDT 30 days. The court accepted respondents' explanations and we discern no ground to interfere with that finding. The court also received significant evidence explaining MDT's special needs. Based on evidence that MDT had several identical outfits and had difficulty bathing because of his sensory issues, the court rejected allegations regarding the child's poor hygiene. The court further accepted testimony from MDT's teacher that it was not uncommon for children with MDT's issues to have difficulty potty training and that other students in the child's class still required assistance as well. Furthermore, respondents and the maternal grandfather testified at length regarding the difficulty they experienced finding dentists to provide estimates for MDT's dental work, hoops Medicaid required the family to jump through before agreeing to pay for treatment through MDT's existing provider. The court did not clearly err in these regards.

The trial court rejected allegations of respondents' physical and mental health issues despite record evidence supporting certain elements of the allegations. Respondent-father's testimony supported that he has hydrocephalus. He has a shunt to drain fluid from his brain and last required brain surgery in 2001. His condition causes seizures and impacts his memory. However, the DHHS presented no evidence that these medical conditions limited respondent-father's ability to parent his children. The caseworker testified that records from earlier child protective proceedings established that respondent-father suffers from bipolar disorder and does not consistently take his medication. At a hearing on January 13, 2021, the caseworker testified that respondent-father disclosed his mental health issues to her "during our initial contact." The caseworker could not find the materials to support her allegations at the hearing, leading the court to find that respondent-father did not currently suffer from mental illness limiting his ability to parent.

Similarly, the trial court found a lack of evidence to support allegations of respondent-mother's mental health issues. Despite the allegations, the DHHS presented no evidence that respondent-mother participated in a neuropsychological evaluation in 2009, during earlier child protective proceedings, or was diagnosed with a lack of insight into her behaviors. Respondent-mother acknowledged the DHHS had concerns about neurological deficits prior to the 2004/2006 terminations, but again, the DHHS did not present documentation to support those allegations in this case. However, in *Thomas I*, unpub op at 5, this Court noted respondent-mother participated in two psychological evaluations in 2009. One psychologist "testified that respondent[-mother] functioned at the borderline range of intelligence, and had somewhat of a disconnection between her cognitive and emotional functions." *Id*. The second provided what this Court described as "[t]he only negative testimony presented" in the 2009 proceeding: the opinion that respondent-mother "lack[ed] a full understanding of her role in the prior terminations." *Id*. This Court thereby acknowledged the existence of evidence that respondent-mother lacked insight into her behaviors. The trial court should have recognized this Court's prior decisions related to this family, including this Court's recitation of record evidence regarding respondent-mother's mental health concerns. But we discern no error requiring reversal given that the ignored evidence was more than a decade old.

The DHHS alleged that respondent-father abused opiates and took psychotropic medications prescribed to JF. The caseworker indicated that EET and AO reported that respondent-father took medication prescribed to his brother, but they did not know "what kind of medications they were." AO denied making this statement at trial. The DHHS provided absolutely no evidence to support these allegations and respondent-father denied abusing any narcotics, prescribed or illegal. Accordingly, we cannot find the trial court clearly erred in this regard.

The most concerning finding made by the trial court was its rejection of the sexual abuse allegations after apparently determining EET was incredible. There was no physical evidence of sexual abuse and EET never disclosed any allegations of sexual abuse to the caseworker. The children were finally interviewed at Care House after their removal, but EET did not disclose any sexual abuse at that interview. Unlike the trial court, we do not deem it "reasonable" for parents to refuse a forensic interview in the face of their child's accusations of sexual abuse against a close family member. Indeed, it runs counter to respondents' duty to protect their children from harm. EET's recent social media posts are alarming and their oversexualized content is indicative of a child who has been abused. Our alarm is exacerbated by allegations that EET is not in school or attending counseling. On the current record and absent an account of the abuse by EET to the caseworker or forensic interviewer, however, we have no ground to interfere with the trial court's assessment of the witnesses' credibility. With evidence in hand, the DHHS is free to file a new petition seeking jurisdiction on these newly arisen grounds.

Evidence of physical abuse was "inconclusive." EET told the caseworker in October 2019, that respondent-mother "grabbed her by the face and was screaming at her." But the physical abuse allegations actually surrounded a small bruise observed on the child's thigh. Respondents took EET to the doctor regarding the injury, and the doctor had no concerns.

The issue of domestic violence in the home also turned into a pure credibility contest. EET advised the caseworker that "domestic violence happens on a daily basis" in respondents' home. Both EET and MDT told the caseworker they witnessed respondent-father spit in respondent-mother's face. During the CPS investigation, AO allegedly reported domestic violence occurred in the children's presence. When she testified at trial, however, AO denied that domestic violence occurred in the home. Respondents and the maternal grandfather described incidents of police coming to the home looking for individuals who did not match the description of any residents. They implied ES was "swatting" them.[1] This was a close call, but we may not interfere with the trial court's credibility assessments.

---

[1] According to the Anti-Defamation League:

> Swatting is the deliberate and malicious act of reporting a false crime or emergency to evoke an aggressive response (often a SWAT team) from a law enforcement agency to a target's residence or place of work to harass and intimidate them. This means that the person doing the swatting reports a fake crime or emergency to get police or other emergency personnel to show up somewhere and possibly scare or cause harm to the individual, group or location they're targeting. [*Swatting: What's Hate Got to Do With it?*, ADL, March 8, 2024, available at

Ultimately, the trial court considered the record evidence (or lack thereof) and assessed the credibility of the witnesses presenting conflicting stories before concluding grounds to take jurisdiction over the children were lacking. We have no ground to interfere with those factual findings and therefore must affirm at this time. Again, we advise the DHHS that it may file a new petition if warranted after gathering evidence to be presented to the court.

We affirm.

/s/ Kristina Robinson Garrett
/s/ Sima G. Patel
/s/ Allie Greenleaf Maldonado

---

<https://www.adl.org/resources/tools-and-strategies/swatting-whats-hate-got-do-it> (accessed June 17, 2024).]